**In re SS & C TECHNOLOGIES, INC., SHAREHOLDERS LITIGATION.**

C.A. No. 1525–N.

Court of Chancery of Delaware, New Castle County.

Submitted: Sept. 27, 2006.
Decided: Nov. 29, 2006.

---

**30.** *In re Pure Resources,* 808 A.2d at 449.

Norman M. Monhait, Esquire, Carmella P. Keener, Esquire, Rosenthal, Monhait & Goddess, P.A., Wilmington, Delaware; Jonathan M. Stein, Esquire, Stuart A. Davidson, Esquire, Lerach Coughlin Stoia Geller Rudman & Robbins, LLP, Boca Raton, Florida; Richard B. Brualdi, Esquire, The Brualdi Law Firm, New York, New York, Attorneys for the Plaintiffs.

R. Judson Scaggs, Jr., Esquire, Morris, Nichols, Arsht & Tunnell, LLP, Wilmington, Delaware, Attorneys for Defendants SS & C Technologies, Inc., William C. Stone, William C. Hunter, David W. Clark, Jr., Joseph H. Fisher, Albert L. Lord, and Jonathan M. Schofield.

Raymond J. DiCamillo, Esquire, Richards, Layton & Finger, P.A., Wilmington, Delaware, Attorneys for Defendant Sunshine Acquisition Corp.

## *OPINION*

LAMB, Vice Chancellor.

### I.

In October 2005, the parties to this litigation, challenging a management led cash-out merger, entered into a memorandum of understanding, agreeing to settle the case based entirely on the inclusion in the merger proxy statement of certain supplemental disclosures. This agreement was reached after a document demand was served but before any depositions were taken. The proxy supplement was mailed and the merger closed on November 23, 2005, the day after the stockholder meeting. At no time before the transaction closed did the parties advise the court of their agreement to settle or ask leave to present the settlement for approval after the conclusion of the transaction.

The parties conducted confirmatory depositions in early 2006 but waited until July 7, 2006 to finalize the stipulation of settlement. The settlement hearing did not occur until September 13, 2006. At that hearing, due perhaps to the passage of time, the plaintiffs' counsel exhibited a striking lack of understanding about basic terms of the transaction, including the terms of senior management's participation in the deal.

For some years, this court has sought to impress on parties to representative litigation the imperative to present settlements for approval before the terms of the settlement are performed. Where litigation challenges a pending transaction and the settlement involves a change in its terms reached before the transaction is completed, court approval of the settlement should, where possible, occur before the transaction closes. At a minimum, where circumstances warrant closing the transaction first, leave of court should be obtained for a delay in presenting the settlement, and the settlement should be presented promptly thereafter.

In this case, the court concludes that it must disapprove the settlement for two independent reasons. First, the parties were dilatory in presenting it for approval. Thus, as a result of the earlier performance of the settlement "consideration," i.e., the publication of some supplemental disclosure, followed by the conclusion of the transaction, the court's review of the settlement terms is substantially emptied of meaning or purpose. There is simply little to commend the process of weighing the

merits of a "settlement" of litigation where the only continuing interest is that of the plaintiffs' counsel in recovering a fee. Second, the court cannot conclude from the record presented that the potential claims belonging to the class were adequately or diligently investigated or pursued. It may be that the financial terms of the transaction were, in fact, fair to the class. But basic questions concerning the fairness of the process pursued in arranging the management led buy-out are left unexplored and unanswered, thus preventing the court from reaching any conclusion that the very modest settlement terms secured fairly, reasonably, or adequately support the dismissal of this action.

## II.

In 2005, SS & C Technologies, Inc. was acquired in a deal sponsored by Carlyle Investment Management L.L.C. The company's Chairman and CEO, William C. Stone, converted 3.92 million shares of his SS & C common stock and all of his SS & C stock options into a 31% equity position in the surviving entity. He received $37.25 per share for his remaining 1.95 million SS & C common shares (the same price received by the other stockholders), for total cash proceeds of approximately $72.6 million. Stone also entered into a new employment agreement, with an initial three-year term, calling for the payment of base salary and a minimum bonus totaling $950,000 per year, plus an award of stock options equal to 2% of the equity in the surviving entity and other benefits.

Carlyle's proposal was solicited by Stone as part of an informal process to "test the waters" regarding a sale of the company during which Stone and an investment banking group retained by him in his official capacity met with six private equity firms. During this process, Stone solicited interest in acquiring SS & C "at a meaningful premium to [its] stock price" but only in a transaction in which he would be expected to "make a significant investment in the acquisition entity and to serve in a continuing capacity ... following any transaction." [1] After several rounds of discussions and negotiations with Stone and his company-paid advisors, and after Stone belatedly informed the board of directors of his activities, Carlyle submitted to Stone a written proposal to acquire SS & C at a price of $37 per share. That proposal contemplated, among other things, that Stone would contribute a significant number of SS & C shares to the acquisition entity in exchange for equity and that he would agree to vote his shares for the deal. Although the details of Stone's participation were left to a later negotiation, Stone understood that Carlyle expected him to contribute in excess of $100 million in the transaction.[2]

Personally satisfied with Carlyle's proposal, dated June 17, 2005, Stone presented it at a meeting of the SS & C board of directors that same day. In response, the board appointed a special committee of disinterested directors and gave that group broad powers to explore all alternatives and to consider, accept, or reject any acquisition proposals. The committee thereafter retained independent legal and financial advisors and embarked on a program to solicit others, including strategic purchasers, to make competing offers. The committee and its advisors also undertook the process of negotiating acceptable deal terms with Carlyle, including an increase in the proposed $37 per share price.

This process came to an end on July 27, 2005, when, having received no other of-

---

1.  Proxy Statement 16.

2.  Stone Dep. 37, Feb. 3, 2006.

fers, the committee and later the board of directors approved a merger agreement with Carlyle priced at $37.25 per share. In addition to some more favorable contract terms, the committee also won the right to pay SS & C's regular $.08 per share dividend before closing. The terms of the transaction were announced early on July 28, 2005.

The announcement of the proposal prompted the filing of two lawsuits in this court: the first on July 28, 2005,[3] and the second a week later.[4] These two actions were consolidated, and lead counsel appointed, by order dated August 31, 2005. The plaintiffs did not move for expedited treatment and never sought preliminary injunctive relief. Instead, evidently on the basis of their review of the preliminary proxy materials and discussions with an expert consultant, "plaintiffs came to the view that certain disclosures were materially misleading and incomplete."[5] In late September, after "several phone calls to discuss material deficiencies ... in the proxy materials," the lawyers for the parties began settlement discussions in earnest. These discussions led to the execution of a Memorandum of Understanding and the dissemination of a supplement to SS & C's proxy materials containing certain additional disclosures.

The parties did not advise the court of these developments or ask leave to present their settlement after completion of the transaction. After the dissemination of a supplement to the proxy statement, the merger closed a month later. As already mentioned, the parties then engaged in a desultory process of confirmatory discovery leading to the filing of a stipulation of settlement in July of 2006.

## III.

In *Chickering v. Giles,*[6] Chancellor Duffy observed that, in reviewing settlements of representative litigation, "the court's function is to consider contested issues, not those which have been made moot by the parties or by events." While recognizing that "in a given case the parties may be faced with an emergency or facts which compel action before the Court can give notice or hold a hearing on a settlement petition"[7] he declined to review a settlement that had been fully accomplished (including the payment of fees to the plaintiffs' lawyer) before the notice of settlement was even mailed.

■ This court, in reviewing settlements, has often reminded counsel of the *Chickering* decision and of the necessity to present settlements quickly and to advise the court when some exigent circumstance makes it difficult or impossible to give the necessary notice and seek formal approval before the performance of some part of the settlement. Here, the proxy supplement that formed the basis for the agreement to settle was mailed, and the transaction closed, without any notice to the court. Thus, at the time of the settlement hearing nearly one year later, the only part of the settlement that had not already been fully performed was the payment of the plaintiffs' counsel fees. In the circumstances, the court declines to approve the settlement as having been untimely presented.

3. *Paulena Partners, LLC v. SS & C Techs., Inc.,* C.A. No. 1525–N, 2005 WL 2000728 (Del.Ch. filed July 28, 2005).

4. *Landen v. SS & C Techns., Inc.,* C.A. No. 1541–N, 2005 WL 2122291 (Del.Ch. filed Aug. 3, 2005).

5. Pls.' Opening Br. 12.

6. 270 A.2d 373 (Del.Ch.1970).

7. *Id.* at 375.

## IV.

▮ The court also declines to approve the settlement because it is unable to conclude, from the record presented, either that the plaintiffs' counsel adequately represented the interests of the class or that the settlement terms are fair and reasonable. The reasons for this conclusion are, briefly, as follows.

Stone, SS & C's CEO, instigated this transaction through the use of corporate resources but without prior authorization from the board of directors. He did so in order to identify a transaction in which he could both realize a substantial cash payout for some of his shares and use his remaining shares and options to fund a sizeable investment in the resulting entity. When Stone identified Carlyle as his chosen partner and negotiated a price at which he was willing to sell a portion of his shares, Carlyle sent a letter to the board of directors making a proposal to acquire the rest of the shares at that price, indicating Stone's agreement to its terms. In response, the board of directors formed a special committee that retained expert legal and financial advisors. But, after a brief effort to identify another buyer, that committee reached agreement with Carlyle at a price only slightly higher than Carlyle negotiated with Stone.

These facts, on their face, raise a series of questions about both Stone's conduct and that of the board of directors. For instance, did Stone misuse the information and resources of the corporation when, acting in his official capacity but without board authorization, he hired an investment banker to help him identify a private equity partner to suit his needs? Another question is whether, given Stone's precommitment to a deal with Carlyle, the board of directors was ever in a position to objectively consider whether or not a sale of the enterprise should take place. Similarly, did Stone's general agreement to do a deal with Carlyle make it more difficult for the special committee to attract competing bids, especially from buyers not interested in having Stone own a significant equity interest in the surviving enterprise? And, did Stone's negotiation of a price range with Carlyle unfairly impede the special committee in securing the best terms reasonably available? These are only some of the important legal issues that result from the way Stone and the board of directors formulated the private equity buy-out of SS & C Technologies.

None of these issues is adequately addressed by the plaintiffs' counsel in connection with the proposed settlement. Indeed, the plaintiffs' submissions, both written and oral, fail to come to grips with the fact that Stone had an array of conflicting interests that made him an unreliable negotiator or that the special committee was placed in a difficult position by Stone's preemptive activities. Most surprisingly, at the hearing, the plaintiffs' counsel told the court that Stone took no cash out of the deal and instead rolled all of his stock and options into equity in the new deal. Suffice it to say that a manager who has the opportunity to both take $72.6 million in cash from the transaction and roll a portion of his equity into a large equity position in the surviving entity has a different set of motivations than one who does not.

When a representative counsel is unable to correctly identify basic terms of the transaction or the basic set of legal issues thereby raised, the court can have no confidence that the interests of the class were adequately represented. This is even more true where the terms of the proposed settlement are entirely non-economic, as here, where the supplemental disclosures supply all of the consideration for the proposed settlement. While it is theo-

retically possible that strong, economic settlement terms would permit the court to overlook the weakness of counsels' presentation, this is not such a case.

### V.

For the foregoing reasons, the proposed settlement is disapproved. IT IS SO ORDERED. Within 15 days of the date hereof, the plaintiffs' counsel shall advise the court whether or not they plan to continue the prosecution of the litigation and, if not, how they propose to proceed.