**In re SS & C TECHNOLOGIES, INC. SHAREHOLDERS LITIGATION.**

C.A. No. 1525–VCL.

Court of Chancery of Delaware.

Submitted: Feb. 22, 2008.

Decided: March 6, 2008.

**49.** *See id.* at 19.

Norman M. Monhait, Esquire, Rosenthal, Monhait & Goddess, P.A., Wilmington, DE; Paul Geller, Esquire, Jonathan M. Stein, Esquire, Coughlin Stoia Geller Rudman & Robbins, LLP, Boca Raton, FL; Richard B. Brualdi, Esquire, John F. Keating, Esquire, The Brualdi Law Firm, New York City, for the Plaintiffs.

R. Judson Scaggs, Jr., Esquire, John P. DiTomo, Esquire, Jean Rousseau Biondi, Esquire, Morris, Nichols, Arsht & Tunnell, LLP, Wilmington, DE; Jeffrey B. Rudman, Esquire, Emily Shulman, Esquire, Wilmer Cutler Pickering Hale and Dorr, LLP, Boston, MA; David Z. Seide, Esquire, Anthony Pellegrino, Esquire, Wilmer Cutler Pickering Hale and Dorr, LLP, Washington, DC, for Defendants SS & C Technologies, Inc., Joseph H. Fisher, David W. Clark, Jr., William C. Hunter, Albert L. Lord, and Jonathan M. Schofield.

Raymond J. DiCamillo, Esquire, Jennifer Veet, Esquire, Richards, Layton & Finger, P.A., Wilmington, DE; James E. Brandt, Esquire, Noreen Kelly–Najah, Esquire, Sabrina Hassan, Esquire, Latham & Watkins, LLP, New York City, for Defendant Sunshine Acquisition Corp.

Lawrence C. Ashby, Esquire, Philip Trainer, Jr., Esquire, Richard L. Renck, Esquire, Ashby & Geddes, P.A., Wilmington, DE; Gregory A. Markel, Esquire, Stacey A. Lara, Esquire, Cadwalader, Wickersham & Taft, LLP, New York City, for Defendant William C. Stone.

## OPINION

LAMB, Vice Chancellor.

In this opinion, the court considers a motion to impose sanctions on the plaintiffs and their counsel. The occasion for this request is (i) a motion filed by the plaintiffs for leave to withdraw, but only on notice to the putative class and (ii) their related opposition to a request that the discovery record pertaining to the plaintiffs (other than personal information of a confidential nature) be made part of the public record. On the record before it, the court concludes that the plaintiffs and their counsel acted in bad faith in connection with their motion to withdraw and should be required to reimburse the defendants for their attorneys' fees and costs incurred in connection with this aspect of the litigation.

## I.[1]

### A. *Procedural History*

This litigation began in 2005 when Carlyle Investment Management L.L.C. sponsored a deal to acquire SS & C Technologies Inc. The SS & C board of directors approved the Carlyle transaction on July 27, 2005. SS & C publicly announced the terms of the transaction and filed a preliminary proxy statement the following day. The SS & C stockholders approved the acquisition, and it closed on November 23, 2005.

#### 1. *The 2006 Proposed Settlement*

Following the announcement of the Carlyle transaction, Paulena Partners and Dr. Stephen R. Landan, filed lawsuits in this court on July 28, 2005, and on August 3, 2005.[2] This court consolidated the two actions and appointed The Brualdi Law Firm and Coughlin Stoia Geller Rudman & Robbins as co-lead counsel on August 31, 2005.[3] In late September, the lawyers for the parties began settlement discussions and, on October 18, 2005, the parties entered into a memorandum of understanding to settle the consolidated action. This agreement provided for the dismissal of the litigation in exchange for supplemental disclosures and the payment of attorneys' fees.

The parties never advised the court of this agreement and never sought leave to present the settlement after the closing of the acquisition. In the months following the closing, the parties performed confirmatory discovery and on, July 7, 2006, submitted the stipulation of settlement for court approval.

At the September 2006 settlement hearing, nearly a year after the closing of the transaction, the parties asked this court to approve the settlement, which had been fully performed in all respects except for the payment of the plaintiffs' counsel fees. In light of the procedural posture of the settlement, this court declined to approve it "as having been untimely presented."[4] Relying on Chancellor Duffy's decision in *Chickering v. Giles*,[5] this court noted the "necessity" in presenting settlements quickly and advising the court "when some exigent circumstance makes it difficult or impossible to give the necessary notice and seek formal approval before the performance of some part of the settlement."[6]

This court also declined to approve the settlement because the record did not support a finding that "the plaintiffs' counsel adequately represented the interests of the class or that the settlement terms [were] fair and reasonable."[7] Indeed, the plaintiffs' counsel failed to "correctly identify

---

**1.** The facts of the transaction underlying this matter are addressed in a summary fashion in this court's prior opinion. *See In re SS & C Techs., Inc. S'holders Litig.*, 911 A.2d 816 (Del.Ch.2006).

**2.** *Paulena Partners, LLC v. SS & C Techs., Inc.*, C.A. No. 1525–VCL, 2005 WL 5758533 (Del. Ch. filed July 28, 2005); *Landen v. SS & C Techs., Inc.*, C.A. No. 1541–VCL, 2005 WL 2122291 (Del.Ch. filed Aug. 3, 2005).

**3.** Significantly, "the plaintiffs did not move for expedited treatment and never sought preliminary injunctive relief. Instead, evidently

on the basis of their review of the preliminary proxy materials and discussions with an expert consultant, 'the plaintiffs came to the view that certain disclosures were materially misleading and incomplete.'" *In re SS & C Techs.*, 911 A.2d at 819 (quoting Pls.' Opening Br. 12).

**4.** *Id.*

**5.** 270 A.2d 373 (Del.Ch.1970).

**6.** *In re SS & C Techs.*, 911 A.2d at 819.

**7.** *Id.* at 820.

basic terms of the transaction or the basic set of legal issues thereby raised."[8]

## 2. *The Subsequent Proceedings*

Despite this court's disapproval of the settlement, the plaintiffs and their counsel chose to continue prosecuting the case. Their interest in pursuing the litigation ended, however, after several damaging facts emerged regarding the adequacy and credibility of the named plaintiffs, and the accuracy of numerous statements made in court filings. Consequently, on November 28, 2007, the plaintiffs moved to withdraw. In response, on January 8, 2008, the defendants filed a motion seeking sanctions and an award of all the fees they incurred in connection with the litigation. The defendants also demanded the removal of the confidentiality restrictions placed on the plaintiffs' deposition transcripts and other discovery materials.

At oral argument, this court concluded that the action should be dismissed without prejudice and without notice to the putative class.[9] In reaching this decision, the court noted the stockholders' convincing approval of the transaction and the apparent adequacy of the disclosures in the proxy materials that were revised as part of the rejected settlement proposal.[10] Indeed, even with the benefit of fairly extensive discovery following the closing of the transaction, the plaintiffs make no substantial added challenges to the proxy statement.[11] The court also relied on the lack of any stockholder interest regarding the proposed settlement and the fact that no stockholder sought to intervene in the case after the rejection of the settlement. In short, nothing about this case suggested the need to notify the putative class of a "without prejudice" dismissal. In addition, at the hearing the court learned that the discovery materials at issue had become part of the public record in the case, thus mooting the issue of continued confidentiality.

As a result, the only remaining claim is the defendants' request for attorneys' fees based on the plaintiffs' and their counsel's conduct in connection with aspects of the litigation.[12]

## B. *Facts Pertinent To The Motion For Sanctions*

Following this court's rejection of the proposed settlement, the defendants conducted discovery of the plaintiffs, including the deposition of Dr. Landan and Paulena's managing partner, Dean W. Drulias. The defendants argue that the facts they discovered reveal a disturbing pattern of

---

8. *Id.*

9. Tr. 64.

10. While approximately 38% of stockholders did not vote in the transaction, only 50,000 voted against it. *Id.* 53–54.

11. For the sake of completeness, the plaintiffs' counsel did raise the possibility of a further disclosure claim at oral argument, arguing:

> [SS & C's CEO's] involvement in the pairing of the list of potential buyers to contact is really not asserted in the proxy statement at all. That gets kind of obscured by a statement in the proxy statement to the effect that [SS & C's advisors] discussed numerous potential acquirers of the corporation and developed a list of five strategic purchasers and two financial purchasers to approach. So there's an arguable disclosure issues there as well.

*Id.* 9. Clearly, the plaintiffs' counsel gave this argument little weight and it appears to have been mentioned primarily to distract attention from the more relevant issues concerning the parties' motions.

12. While the defendants' brief refers to Court of Chancery Rule 11, their motion neither referred to that rule nor complied with its formal requirements.

conduct by the plaintiffs and their counsel in connection with this and other litigation. Most notably, they allege that Drulias manages a web of small investment partnerships for the sole purpose of bringing stockholder lawsuits primarily through his attorney in this action, Richard B. Brualdi. The defendants further contend that Drulias and Brualdi have attempted to conceal the existence of this enterprise from the court. The defendants also challenge the adequacy of both plaintiffs, but particularly Landan, due to their inability to recall basic aspects of the SS & C litigation at their depositions.

### 1. Drulias And The Web Of Investment Partnerships

The disturbing nature of Drulias's investment partnerships came to light after his counsel informed the defendants that the complaint had incorrectly identified Paulena as the plaintiff, when the actual SS & C stockholder was another entity that Drulias manages, Bamboo Partners (since renamed DD Equity Trading).[13] This notice evidently led the defendants to inquire into the nature of these partnerships.

At his deposition, Drulias stated that he believed he currently manages four partnerships, but he also conceded to some degree of current or past managerial control at two other partnerships.[14] Drulias owned a roughly 2% interest, mostly through other partnership interests,[15] in each entity. The names of these partnerships are Vision Partners, DD Equity Trading, Freeport Partners, Momentum Partners, and Advantage Partners,[16] and one additional partnership, the name of which he could not remember.[17] While Drulias's total investment in these entities is not clear, he paid roughly $4,000 for his interest in Bamboo and Paulena.[18] Each of these partnerships owns only a few shares (in this case 3) in roughly 60 to 80 public companies.[19] Thus, at any given time these partnerships give Drulias a minuscule, indirect interest in several hundred publicly traded companies.

In explaining the purpose of these entities and the reason for having numerous partnerships, Drulias claimed that it serves "to permit each of the partners to have the opportunity to establish a track record on his own, with one or two vehicles as a manager."[20] He contended that the investment criteria was to "look for under-

---

**13.** Drulias also changed the name of Paulena to Vision Partners. According to Drulias, the name changes were done to "differentiate the time when Paul Berger was managing" and not "driven by litigation in any way." Drulias Dep. 71. Berger stopped managing Bamboo and Paulena around January 2007, when Drulias took over. *But see infra* note 63. Brualdi notified counsel for the defendants of Drulias's error in naming Paulena on July 18, 2007, stating, in pertinent part:

> [W]hile gathering documents to respond to defendants' discovery requests, my client contact discovered that this lawsuit was originally inadvertently filed in the name of Paulina [sic] Partners when the stock was actually held by another partnership he is involved with, Bamboo Partners. Further, in January 2007, Bamboo Partners changed

its name to DD Equity Trading. Accordingly, we would propose to file a stipulation substituting DD Equity Trading for Paulina [sic] Partners as a plaintiff.

Pls.' Br. Ex. E.

**14.** Drulias Dep. 113; 80; 86.

**15.** *See id.* 35–37; 39; 44; 75; 86; 90.

**16.** *Id.* at 80.

**17.** *Id.* at 86.

**18.** *Id.* at 39; 44.

**19.** *Id.* at 82.

**20.** *Id.* at 86–87.

valued companies" and to "hold them and watch them grow."[21] This testimony, however, was undermined by Drulias's later admission that he did not receive a significant amount of money for managing the investment partnerships and that the investment vehicles are economically irrelevant to him.[22] Nevertheless, Drulias continues to maintain that these partnerships were established and managed to make a profit, and he denies that they serve only to bring stockholder lawsuits.[23]

Not surprisingly, these partnerships have, in fact, filed an unusually large number of stockholder lawsuits. They are also consistently represented by The Brualdi Law Firm. Drulias testified that he was involved in bringing roughly 30 stockholder lawsuits on behalf of himself and many of these entities, although he could not be certain of the exact number.[24] Drulias attributed the large number of lawsuits to his interest in enforcing good corporate governance standards. More specifically, Drulias testified:

> I bring a lawsuit when I feel that there is some issue that needs correcting and there is some action which may affect the people, which includes me. Quite often my interest financially is not a huge stake, but I have spent a career in corporate law and my experience is that sometimes people do overreach. That troubles me not only from a financial standpoint where I may not have much of a financial stake, but also from the

fact that that has been my business, and if it harms the kind of business I do I feel sort of a personal stake in harming myself.[25]

Clouding this testimony is the fact that Drulias and his associate Berger made a number of false statements in documents filed with this court. These misstatements are easily susceptible to the inference that they were made to conceal the existence and nature of this web of partnerships and their evident litigation spawning purpose. These misrepresentations began with the naming of Paulena as the plaintiff. While there is no reason to think that this error occurred other than by inadvertence, this error appears to have precipitated the later, more problematic, statements.

First, at the time of the settlement, Berger was the managing partner of Paulena. He submitted a declaration in support of the settlement on September 8, 2006, representing that "[a]t the time of the filing of the complaint and at all relevant times hereto, Paulena owned the common stock of SS & C Technologies, Inc. . . . ."[26] The same representation was repeated at the settlement hearing.[27] Second, on February 8, 2007, pursuant to then newly adopted Court of Chancery Rule 23(aa), Drulias filed an affidavit identifying himself as the manager of DD Equity Trading, which he refers to in his affidavit as the "successor to Paulina [sic] Partners, one of the named plaintiffs in this litigation."[28]

---

21. *Id.* at 111.

22. *Id.* at 94.

23. *Id.*

24. *Id.* at 72; 82–83. *See* App. Dfs.' Br. Ex. 12. Drulias was evasive in response to the number of lawsuits that he had personally been involved in, aside from cases involving share ownership in public companies. While Drulias initially only admitted that he was a

party in two lawsuits, he eventually acknowledged being a party in fourteen different proceedings. Drulias Dep. 16–25.

25. Drulias Dep. 122–23.

26. Dfs.' Br. App. Ex. 8 ¶ 2.

27. Dfs.' Br. App. Ex. 10 at 7:5–7.

28. Dfs.' Br. App. Ex. 11.

Thus, the first mention of DD Equity Trading falsely identifies it as Paulena's successor, thus suggesting that it had, by operation of law, succeeded to Paulena's interest in SS & C. This usage suggests to the court that, by identifying DD Equity Trading as Paulena's successor, Drulias (or his counsel who prepared the affidavit) were hoping to avoid having to disclose that Paulena was never a SS & C stockholder. Drulias contends that this misstatement was nothing more than an honest mistake.[29] In fact, Drulias's counsel largely assumes the blame for this error, attributing it to their mistaken belief that Paulena had become DD Equity Trading.[30] Nevertheless, the suggestion of misdirection is strong, and nothing Drulias or his counsel has submitted suggests that he ever thought that DD Equity Trading was the same entity as, or a legal successor to, Paulena.

Drulias and his counsel claim that they did not discover the error in naming Paulena as the plaintiff until Drulias undertook to respond to the defendants' document requests in July 2007.[31] Brualdi notified the defendants of this fact on July 18, 2007 and asked if they would agree to a substitution.[32] The defendants withheld their consent, and the plaintiffs filed a motion to substitute on August 3, 2007.

Drulias's prior litigation history was a further source of serious misstatements to the court. Most remarkably, the plaintiffs' reply brief on the motion for sanctions flatly denies that Drulias was actively involved in previous litigation brought by Momentum Partners and Freeport Partners, stating "[w]hile Drulias may have investments in other partnerships that may have filed lawsuits, he does not manage those partnerships or determine when suit is instituted on their behalf."[33] The plaintiffs' counsel continued to downplay Drulias's litigation record at oral argument and rejected the defendants' contention that Drulias managed any investment partnerships besides Paulena and Bamboo (now DD Equity Trading).[34]

In response, at the hearing on the motion to substitute, the defendants' counsel

---

**29.** In Drulias's August 3, 2007 affidavit filed in support of the motion to substitute Paulena with DD Equity Trading, he stated that the false affidavit from Berger and his own February 2007 affidavit were simply due to his original mistake in naming Paulena as the appropriate plaintiff. More specifically, Drulias stated the following:

> [W]hile it has been several years since the original mistake was made and thus difficult to ascertain exactly what caused me to make it, I note that I acquired an ownership interest in both Bamboo and Paulena in the same time frame and that Mr. Berger was then the Manager/Managing Partner of both entities, and that these similarities likely caused my confusion.

**30.** Letter from Richard B. Brualdi, filed February 22, 2008. Brualdi's letter states, as follows:

> The passage of time dimmed memories. However, as best as I can ascertain at this point, the error arose because our firm mistakenly believed (based in large part on the

filing of the original complaint in the name of Paulena Partners) that it was Paulena Partners that had become DD Equity and Mr. Drulias did not correct us. At this time [Drulias] cannot recall whether that was because he also was mistaken and did not check his records, or he did not focus on the error in the affidavit.

**31.** At his deposition, Drulias stated: "I was requested to produce documents relating to the [defendants'] document request, among those documents were brokerage statements. I went to the file that I maintained of the brokerage statements and discovered that Paulena did not own shares of SS & C, but rather Bamboo did." Dfs.' Br. App. Ex. 5 at 117.

**32.** *See supra* note 13.

**33.** Pls.' Reply 20–21.

**34.** *See* Tr. 18.

presented the court with five affidavits signed by Drulias swearing that he is the manager of Momentum Partners and Freeport Partners. The affidavits were submitted in connection with five separate cases, four of which were filed in this court. In each of those cases, Drulias was represented by Brualdi and, in three of the four filed in this court, Rosenthal Monhait & Goddess appeared as Delaware counsel.

In light of these contradictions, this court, by letter dated February 8, 2008, asked the plaintiffs' counsel to "investigate the source of this inconsistency and submit a full explanation." In Brualdi's February 22 response, he assumes all of the blame for the errors, citing Drulias's deposition testimony that he managed these two entities. Brualdi's explanation, however, was utterly unsatisfying, stating "[m]ost of the reply brief was drafted in the first instance by my firm. I personally reviewed and edited a draft of the brief. However, regrettably we did not notice the error and hence did not correct it."

Needless to say, this response does not explain how the "error" found its way into the brief in the first place—instead passing it off as a mere editing problem. More importantly, the letter fails to explain how such an important factual misstatement could result from an error at all, particularly in light of the plaintiffs' counsel's

extensive representation of Drulias and the very partnerships in question.

### 2. *Dr. Stephen Landan*

Landan's deposition gives rise to a different set of troubling issues. Landan demonstrated a striking lack of knowledge of the SS & C litigation and testified to very little participation in its prosecution. For example, he conceded that, despite having no knowledge of the terms of the proposed settlement, he signed a declaration, under oath, that the settlement was "fair, reasonable and adequate."[35] Landan also admitted that he never read the SS & C proxy, and therefore, could not describe what disclosures he challenged.[36] Further, he was unable to recite a single substantive aspect of the Carlyle transaction and he did not even understand investment concepts essential to formulating an informed objection to the acquisition.[37]

Additionally, in discussing his participation in the litigation, it was clear that Landan had little, if any, involvement. He remembered that he "filled out some kind of form on the internet," that stated "[s]omething about opposing the buyout of SS & C."[38] He could not recall how he came across the internet form and he did not remember seeing the complaint before his attorney filed it.[39] Moreover, Landan

---

35. Landan Dep. 107.

36. *Id.* at 89–90.

37. *Id.* at 94–95.

38. *Id.* at 9–10.

39. *Id.* at 116–17. Near the end of the deposition, Landan and his counsel took a short break, and when Landan returned he was able to recite far more information about the allegations in the complaint. The defendants contend that Landan's sudden recollection was due to improper coaching by his attorney, an allegation Landan and his attorney deny. While this court notes the suspicious

circumstances and detail of this sudden recollection and the subsequent decision by Landan and his counsel to dismiss him from the litigation, Landan's testimony has little bearing on this court's ruling. For the sake of completeness, Landan did file an affidavit explaining his inability to recall the details of the litigation. That affidavit also included the following statement:

> I now recall that I did discuss the proposed settlement with [my attorney] prior to the time he attempted to settle my case, and that the proposed settlement dealt with the disclosure of additional information to the shareholders of SS & C. I had several conversations with my lawyer about many as-

stated that his attorney never consulted him about the attorneys' fees he was seeking and had no knowledge of the fee amount his attorney ultimately negotiated with the defendants.[40] Surprisingly, Landan thought the fee arrangement was entirely up to his lawyer and the court.[41]

### 3. *The Motion To Withdraw On Notice*

Following these depositions, both of the plaintiffs sought dismissal from this litigation. Drulias directed his counsel to withdraw Paulena and DD Equity Trading immediately. Landan and his counsel "mutually agreed" that he "might not be perceived as an adequate class representative" and he authorized his attorney to seek his dismissal.[42]

The plaintiffs' counsel notified the defendants that the plaintiffs intended to withdraw, but a conflict arose as to whether the discovery record concerning the plaintiffs would remain confidential. The plaintiffs and their counsel offered a "quiet" dismissal in return for maintaining the confidentiality restrictions. The defendants, however, wanted to unseal the record and use it to publicly criticize the plaintiffs, their counsel, and the current state of stockholder litigation. Eager to avoid such public criticism, the plaintiffs' counsel told the defendants' counsel that, if the defendants insisted on opening up the record, they would move for an order conditioning their withdrawal on notice to the class and would approach their institutional clients to intervene. When this gambit failed to secure an agreement to continue confidentiality, cross motions were filed:

one by the plaintiffs to withdraw on notice, and a second by the defendants to unseal the record and for sanctions. As already mentioned, the only issue remaining is the availability of sanctions.

### II.

This court must decide whether to award the defendants a portion of their costs in defending this case. In support of their motion, the defendants argue that the plaintiffs (1) brought suit with no factual investigation, (2) improperly spearheaded the suit for inadequate plaintiffs, (3) submitted false statements to the court, (4) coached Landan at his deposition, (5) abandoned their duties to this court and the class members by seeking a silent withdrawal to avoid public scrutiny of their conduct, and (6) threatened the defendants with approaching their institutional clients for a substitute plaintiff if the defendants did not agree to a quiet withdrawal.[43]

In response, the plaintiffs argue, relying in part on this court's opinion rejecting approval of the settlement, that shifting fees would be inappropriate because their claims are well-founded. The plaintiffs contend that they properly investigated the allegations in their complaints by reviewing "numerous" documents in the public record, including press releases, news articles and SS & C's filings with the Securities and Exchange Commission.[44] Further, the plaintiffs' counsel argue that before Landan's deposition they mistakenly, but reasonably, believed he would be an adequate plaintiff since he is a "highly educated professional," and he authorized

---

pects of the litigation, including the settlement, over the course of the past 2½ years. Landan Aff. 7, filed January 31, 2008.

**40.** Landan Dep. 85–87.

**41.** *Id.* at 41.

**42.** Landan Aff. ¶ 12, filed January 31, 2008.

**43.** Dfs.' Br. 47–48.

**44.** Brualdi Aff. ¶ 4, filed January 31, 2008; Stein Aff. ¶ 6, filed January 31, 2008; Pls.' Reply 17.

the filing of the lawsuit on his behalf. The plaintiffs' counsel also base this position on Landan's production of documents and responses to interrogatories, their efforts to keep him apprised of the litigation, and the affidavits he executed in support of the settlement. With respect to Drulias, the plaintiffs' counsel assert that Drulias's deposition testimony demonstrates that he understood the basis for the lawsuit and actively participated in its prosecution. According to the plaintiffs' counsel, the nature of Drulias's investments and the number of lawsuits he has been involved in does not preclude him from serving as lead plaintiff.[45]

The plaintiffs largely ignore the defendants' accusations that Drulias, through his various partnership interests, operates a "litigation kennel" and acts as a "professional plaintiff." They do, however, argue that Drulias "uses litigation to seek review of possible self-dealing" and that is irrelevant to the issue of notice.[46] Further, the plaintiffs contend that Drulias's litigation experience "enhances, rather than detracts" from, a finding that Drulias is an adequate plaintiff.[47] The plaintiffs also argue that the size of a plaintiff's holdings is not a factor when considering adequacy.

The plaintiffs characterize the numerous misstatements to the court as "honest mistakes" that did not prejudice the defendants. The plaintiffs contend that these errors were due to carelessness and poor memory and were not motivated by any intent to deceive the court or the defendants. In addition, the plaintiffs' counsel and Landan strongly deny that Landan was "coached" at a break in his deposition. Finally, the plaintiffs defend their negotiation tactics in trying to withdraw from the litigation as entirely appropriate since "Delaware law permits, but does not require, notice prior to dismissal of a putative class action."[48]

## III.

■ Delaware follows the general rule that, regardless of the outcome of litigation, each party is responsible for paying his or her own attorneys' fees.[49] This is commonly referred to as the American Rule and it has several recognized exceptions, including the "bad faith" exception.[50] The United States Supreme Court established this exception in *Roadway Express v. Piper*.[51] Significantly, the bad faith exception "is not restricted to cases where the action is filed in bad faith."[52] Indeed, " 'bad faith may be found, not only in the actions that led to the lawsuit, but also in the conduct of the litigation.' In such cases, the fees typically awarded are the additional fees incurred as a result of the bad faith conduct."[53]

■ This court has broad discretion to award attorneys' fees where litigation was brought in bad faith or where bad faith conduct by one of the parties increases the costs of the litigation.[54] This serves

45. Pls.' Reply 23.

46. *Id.* at 13.

47. *Id.* at 22.

48. *Id.* at 1.

49. *Johnston v. Arbitrium (Cayman Islands) Handels AG,* 720 A.2d 542, 545 (Del.1998).

50. *Id.*

51. 447 U.S. 752, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980).

52. *Id.* at 766, 100 S.Ct. 2455.

53. *Id.* (quoting *Hall v. Cole,* 412 U.S. 1, 15, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973)).

54. *See Arbitrium (Cayman Islands) Handels AG v. Johnston,* 705 A.2d 225, 231 (Del.Ch. 1997); *see also Openwave Systems, Inc. v. Harbinger Capital Partners Master Fund I,*

to " 'deter abusive litigation in the future, thereby avoiding harassment and protecting the integrity of the judicial process.' "[55] "Although there is no single definition of bad faith conduct, courts have found bad faith where parties have unnecessarily prolonged or delayed litigation, falsified records or knowingly asserted frivolous claims."[56] "To award fees under the bad faith exception, the party against whom the fee award is sought must be found to have acted in *subjective* bad faith. A finding of bad faith involves a higher or more stringent standard of proof, *i.e.,* 'clear evidence.' "[57]

## IV.

In this case, as the defendants' counsel conceded at oral argument, the record does not support a finding that the entire litigation was brought in bad faith. Most obviously, the record supports a conclusion that the Coughlin Stoia firm had reason to believe that Landan would be an adequate representative plaintiff up until the time his deposition was taken. Less significantly, the limited record available to the court on this motion does not permit the court to find by clear evidence that the nature of the partnerships that Drulias and Berger manage or their relationship with the Brualdi Firm is such that they can never serve as representative plaintiffs. To be clear, those entities and that relationship raise very disturbing questions and may well disqualify those partnerships or the persons associated with them from serving in a representative capacity in the future; nevertheless, the court cannot conclude

from the sparse record before it here that the standard for finding bad faith litigation is met in this case.

■ There is, however, clear evidence that the plaintiffs acted in bad faith in bringing the motion to withdraw conditioned on notice to the putative class. As the plaintiffs' counsel conceded at oral argument, they were ready to withdraw without notice if the defendants would only agree to maintain the confidentiality restrictions on the discovery materials. According to the plaintiffs' counsel, they informed the defendants that if they "persisted in making the plaintiffs' discovery public ... [they] would seek leave to send notice to the class."[58] The plaintiffs defend these tactics as entirely appropriate, arguing:

> [I]t was obvious that defendants were not satisfied with an end to the case and intended to embarrass and attack plaintiffs and their counsel personally and professionally. Seeking to serve as a class plaintiff or class counsel does not obligate a shareholder or lawyer to make himself a target for opponents' vindictiveness. Nor is a withdrawing plaintiff who is receiving no payment required or even expected to provide notice to class members; cases are regularly dismissed without notice and the relatively few decisions on dismissal notice demonstrate how rare the procedure is. Plaintiffs' counsel proposed a meritorious application that is available under the case law and entirely discretionary in an effort to avoid the unpleas-

---

*Ltd.,* 924 A.2d 228, 245 (Del.Ch.2007) ("While the award of attorneys' fees is 'unusual' relief, the Court of Chancery has broad discretion in making such awards.").

**55.** *Kaung v. Cole Nat. Corp.,* 884 A.2d 500, 506 (Del.2005) (quoting *Brice v. State,* 704 A.2d 1176, 1178 (Del.1998)).

**56.** *Johnston,* 720 A.2d at 546 (footnotes and citations omitted).

**57.** *Arbitrium,* 705 A.2d at 232 (emphasis in original).

**58.** Tr. 29.

antness redolent in defendants' papers. That is a threat only in the sense that it is well grounded in decisional law and the record developed in this case, and raises the prospect of a consequence defendants would prefer to avoid.[59]

This position makes clear that the plaintiffs' motion to withdraw on notice was not based on a good faith belief that notice was required-or even likely to advance the best interests of the former SS & C stockholders. Instead, the decision to demand notice to the putative class was simply part of an effort to maintain the confidentiality of the discovery record relating to Drulias, the partnerships he and Berger manage, and Landan. Not only is the plaintiffs' willingness to completely change their legal argument to further their interests in concealing the record of dubious propriety,[60] their motion was not meritorious and served only to advance their selfish motives.[61] That conduct amounted to an abuse of the judicial process and clearly evidences bad faith.[62]

This conclusion of bad faith is buttressed by the series of misstatements made in filings that tended to misrepresent or downplay the facts relating to Drulias's numerous "investment" partnerships and their (and his) role in other litigation filed by The Brualdi Firm. Most importantly for this purpose, the plaintiffs' reply brief filed in connection with the pending motions significantly mischaracterized Drulias's litigation history and his connection to those partnerships. Those false statements, when considered in the context of the plaintiffs' and their attorneys' other less serious misstatements,[63] demonstrate a pattern of, at best, carelessness, and, at worst, a deliberate effort to mislead the court. The confusion created by these submissions imposed additional and unnecessary burdens on the defendants and the court, further warranting shifting fees for the plaintiffs' motion to withdraw and for the motion to unseal and for sanctions.

## V.

As noted, and in recognition of the well settled principle that fees should only be

59. Pls.' Reply 13 (citations omitted).

60. *Cf. Arbitrium*, 705 A.2d at 235 (holding that the defendants conducted their defense in bad faith, in part, because they "disavowed their previous litigation positions to justify an indisputable breach" of a standstill agreement).

61. *See id.* (finding bad faith where the defendants contested an action for "ulterior reasons unrelated to the merits" to protect their self-interest at a time when they knew the claim was valid).

62. The plaintiffs' counsel's attempt at oral argument to justify their original intention to withdraw without notice is unpersuasive, particularly in light of the plaintiffs' counsel's conduct in this litigation. Counsel argued that, notwithstanding the concerns about the confidentiality of the discovery record, they felt notice became necessary when they learned about the defendants' intended public campaign. According to counsel, this would have created confusion about the status of the litigation, making notice necessary to properly inform the former SS & C stockholders. However, the plaintiffs' counsel made clear at oral argument and in their briefs that the impetus for their motion was to deter removal of the confidentiality restrictions, and this last minute attempt to interject a proper basis for their sudden change in position does not justify their motion.

63. In Drulias's August 3, 2007, affidavit he states that "on or about October 1, 2006" Bamboo Partners changed its name to DD Equity Trading, but in the plaintiffs' reply brief they state, "[i]n January 2007, Bamboo Partners changed its name to DD Equity Trading Company...." Drulias Aff. 2, filed August 3, 2007; Pls. Reply 18 n. 11. In Drulias's February 8, 2007 affidavit, the notary caption states "before me ... personally appeared Stephen Landan...."

shifted in exceptional cases, this court will not grant the defendants' request for all fees incurred in defending the litigation.[64] This court has "broad discretion in fixing the amount of attorney fees to be awarded,"[65] and, so, will limit the award to the fees the defendants reasonably incurred in defending the motion to withdraw and in bringing the motion to unseal and for sanctions.[66] To date, the defendants have not provided the court with a statement detailing the attorneys' fees, and other litigation expenses incurred in connection with those motions. Therefore, further proceedings are needed to determine the proper amount of the award. The parties are directed to confer and, within 10 days, submit a schedule to bring this matter to a conclusion. IT IS SO ORDERED.

---

**64.** The plaintiffs' primary argument against the application of bad faith centers on their position that the underlying allegations in their complaint are meritorious. The plaintiffs argue that "after post-settlement hearing briefing in which defendants vigorously advocated that the claims were meritless, the Court found the claims asserted to be sufficiently meritorious to warrant rejection of a therapeutic settlement." Pls.' Reply 21. The plaintiffs' reliance on this court's rejection of the settlement they proposed is misguided. That decision should not be read as any sort of determination of the merits. Indeed, both bases for rejecting the settlement depended on the court's criticism of the plaintiffs' counsel's conduct of the litigation and presentation of the proposed settlement. Finally, this court is only granting the defendants the fees they incurred in connection with the plaintiffs' motion to withdraw and the related motion to unseal and for sanctions and does not rest on a finding that the underlying merits of the plaintiffs' claims were unfounded. *Cf. Batson v. Neal Spelce Assocs., Inc.,* 805 F.2d 546, 550 (5 Cir. 1986) ("[W]hile the presence of merit in a claim or defense may negate any finding of bad faith in its filing, it cannot justify abuse of the judicial process in the method of prosecution.").

**65.** *Johnston,* 720 A.2d at 547.

**66.** *See Judge v. City of Rehoboth Beach,* 1994 WL 198700, at *7 (Del.Ch. Apr. 29, 1994) ("Plaintiffs are entitled to an award ... including time spent on a petition for attorneys fees.").