**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

MORGAN T. ZURN
VICE CHANCELLOR

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 11400
WILMINGTON, DELAWARE 19801-3734

July 10, 2023

John M. Seaman, Esquire
Abrams & Bayliss LLP
20 Montchanin Road
Suite 200
Wilmington, DE  19807

Kenneth J. Nachbar, Esquire
Morris Nichols Arsht & Tunnell LLP
1201 North Market Street
Wilmington, DE  19801

RE: ***Lawrence B. Seidman v. Blue Foundry Bancorp,***
    Civil Action No. 2022-1155-MTZ

Dear Counsel:

I write to regretfully shift fees for glaringly egregious litigation conduct in defending against a books and records request.

## I.    BACKGROUND

Defendant Blue Foundry Bancorp ("Blue Foundry," the "Company," or "Defendant") is a publicly traded Delaware corporation with its principal place of business in Parsippany, New Jersey.[1]  The Company has been the holding company for Blue Foundry Bank since July 15, 2021, following the completion of the

---

[1] Docket Item ("D.I.") 37 [hereinafter "PTO"] ¶ 11.

mutual-to-stock conversion of Blue Foundry, MHC, a New Jersey-chartered mutual holding company.[2]

Plaintiff is a stockholder of record and a beneficial owner of Blue Foundry common stock.[3] Throughout 2021, Plaintiff grew alarmed that Blue Foundry intended to pay non-employee directors and senior management compensation that he felt was excessive in light of the Company's financial performance.[4]

Plaintiff aired his concerns to Blue Foundry's senior management.[5] On June 7, 2021, Plaintiff met with Jim Nesci, Blue Foundry's President and Chief

---

[2] Blue Foundry Bancorp, Annual Report (Form 10-K), at 6 (Mar. 14, 2022). *In re Rural Metro Corp. S'holders Litig.*, 2013 WL 6634009, at *7 (Del. Ch. Dec. 17, 2013) ("Applying [Delaware] Rule [of Evidence] 201, Delaware courts have taken judicial notice of publicly available documents that 'are required by law to be filed, and are actually filed, with federal or state officials.'" (citations omitted) (quoting *In re Tyson Foods, Inc. Consol. S'holder Litig.*, 919 A.2d 563, 584 (Del. Ch. 2007))).

[3] PTO ¶ 10.

[4] *See, e.g.*, D.I. 32 at Deposition Transcript of Lawrence B. Seidman [hereinafter "Seidman Dep."], at 61 (testifying that Plaintiff and Nesci "talked about the benefit plan coming up with an appropriate performance standard, so that not only would his directors be compensated, but his shareholders would make money"); *id.* 63 ("Q. And what did you discuss in that phone call? A. Again, the performance standard . . . ."); *id.* 66 (testifying that, on May 2, 2022, Plaintiff spoke with Nesci regarding Blue Foundry's equity incentive plan and "discussed putting a proper performance standard upon it, so that the directors get paid and the shareholders make money and not using the [Luse Gorman], if you're breathing, you get the benefits"); *see also* PTO ¶ 17 ("Plaintiff had at least two meetings with Nesci and other [Blue Foundry] representatives to discuss, among other things, the Company's post-IPO strategic initiatives and equity incentive plan. The first meeting occurred sometime in 2021. The second meeting occurred on May 2, 2022.").

[5] PTO ¶ 17.

Executive Officer, to discuss, among other things, the long-term equity incentive plan that Blue Foundry intended to adopt following the Company's initial public offering.[6] Plaintiff advocated for "an appropriate performance standard."[7]

On July 15, 2021, Blue Foundry completed its conversion into a publicly traded Delaware corporation.[8] On March 14, 2022, Blue Foundry filed a Form 10-K disclosing that it lost $36.3 million in 2021.[9]

On May 2, 2022, Plaintiff met with Nesci a second time to discuss the Company's forthcoming long-term equity incentive plan and argued that the restricted stock awards should be subject to a performance standard.[10] The record suggests that at this meeting, Plaintiff offered he knew "major players" in the northern New Jersey real estate market, who he described as "real estate people who have been referred to as the real estate Jewish mafia," and stated he could introduce Nesci to those "major real estate players."[11] Nesci declined Plaintiff's

---

[6] Seidman Dep. 59–61.

[7] *Id.*; *see id.* 62 ("We discussed the frameworks of a performance standard that would be beneficial to the management and directors and the shareholders.").

[8] Blue Foundry Bancorp, Annual Report (Form 10-K), at 6, 54, 66, 102 (Mar. 14, 2022).

[9] Blue Foundry Bancorp, Annual Report (Form 10-K), at 37, 49 (Mar. 14, 2022).

[10] Seidman Dep. 66; *see* PTO ¶ 17.

[11] Seidman Dep. 61–62; D.I. 43, Ex. 9 [hereinafter "Blue Foundry's Am. Interrog. Resp."] at Resp. No. 8 (placing this discussion at the May 2 meeting).

recommendation to tie Blue Foundry's restricted stock awards to any sort of performance standard. In response, Plaintiff launched a "vote no" campaign urging Blue Foundry stockholders to vote against the Company's forthcoming proposal.[12]

On July 18, 2022, Blue Foundry filed a proxy statement with the Securities and Exchange Commission (the "Proxy") disclosing that its board had unanimously approved, and was recommending that the Company's stockholders approve, its proposed 2022 Equity Incentive Plan (the "Equity Plan").[13] The Proxy disclosed that under the Equity Plan, the Company's directors would each receive 42,783 restricted stock awards and 106,959 stock option awards (collectively, the "Director Awards").[14] Blue Foundry valued the restricted stock awards at $504,839 per director but stated it could not determine the value of the stock option awards because their value would depend on the exercise date. The Proxy further

---

Plaintiff's offhand reference to this term became a focus of the Company's in discovery. Perhaps the Company thought the term connoted some engagement in organized crime. To be abundantly clear, I do not interpret the term that way, and do not understand why the term took on such outsized importance in the Company's defense.

[12] Specifically, on June 21, 2022, Plaintiff filed a notice of exempt solicitation urging Blue Foundry stockholders to vote against the Company's forthcoming request for stockholder approval of its stock-based benefit plans in light of the Company's poor performance. PTO ¶ 18.

[13] D.I. 47, Ex. 12 [hereinafter "Proxy"]; PTO ¶ 19.

[14] Proxy at SEIDMAN_00120–27.

disclosed that the Compensation Committee intended to grant equity awards to

senior management and that such awards were "discretionary."[15]

The Proxy also disclosed the factors considered by the Compensation

Committee, noting consideration of Blue Foundry's peer group:

> The Compensation Committee considers a number of factors in its decisions regarding executive compensation, including, but not limited to, the level of responsibility and performance of the individual executive officers, the overall performance of Blue Foundry Bancorp and a peer group analysis of other financial institutions. In order to identify the appropriate compensation level necessary to attract and retain the talent to build the institution, we consulted with our compensation consultant in developing our peer group. Our peer group is comprised of institutions of similar complexity, within the tri-state geographic area, having approximately $400 million in equity and an asset size of approximately $3 billion.[16]

On July 29, 2022, Plaintiff filed a second notice of exempt solicitation urging

Company stockholders to vote against the Equity Plan.[17]

On August 25, 2022, the Company held its annual meeting (the "Annual

Meeting").[18] During the Q&A session of the Annual Meeting, the Company

denied that it had conducted a peer group analysis of the Equity Plan. When asked

---

[15] Proxy at SEIDMAN_00127. Blue Foundry concedes that the awards to management were "discretionary." *See, e.g.*, PTO ¶ 22.

[16] Proxy at SEIDMAN_00107.

[17] PTO ¶ 25.

[18] *Id.* ¶ 26.

whether the Company had "a peer group comparison of the cost of the benefit plan," Nesci responded: "I do not have a peer group comparison of the cost of the benefit plan to compare to at this juncture. My assumption is, as I work with the comp committee, a peer comparison will be built."[19] Following the Q&A session, Company stockholders approved the Equity Plan. Beginning on October 19, 2023, the Compensation Committee began granting stock option awards to senior management.

In the meantime, on September 23, 2022, Plaintiff made a written demand pursuant to Section 220 of the Delaware General Corporation Law ("Section 220") seeking, among other things, copies of any compensation consulting reports received by the board in connection with the Equity Plan (the "September 23 Demand").[20] On October 7, Blue Foundry rejected the September 23 Demand, claiming that Plaintiff lacked a proper purpose for seeking inspection and refusing to produce a single document.[21]

---

[19] D.I. 47, Ex. 14. Plaintiff produced an audio file to the Court. The Court has verified this quote.

[20] D.I. 43, Ex. 2.

[21] D.I. 43, Ex. 3.

On October 28, Plaintiff filed a books and records action in New Jersey.[22] Blue Foundry responded that the New Jersey Superior Court lacked jurisdiction and that the Company's forum selection clause required Plaintiff to file his books and records action in Delaware.[23] On November 7, Plaintiff voluntarily dismissed the New Jersey action.

On December 1, Plaintiff served the operative books and records demand (the "Demand") requesting copies of any compensation consulting reports received by the board and any other formal board materials concerning the evaluation and approval of the Equity Plan and all presentations to the board by senior management.[24] The Demand explained Plaintiff sought inspection for the purposes of investigating mismanagement and communicating with Plaintiff's fellow stockholders regarding any proxy contest or other corrective measures.[25] Defendant refused to produce a single document.

Plaintiff filed this action on December 14. Blue Foundry pled four defenses in its answer: (1) failure to state a claim; (2) failure to comply with 8 *Del. C.* §220

---

[22] D.I. 43, Ex. 4.

[23] D.I. 17, Ex. 7.

[24] D.I. 1, Verified Complaint for Inspection of Books and Records, Ex. A [hereinafter "Demand"], at 5.

[25] Demand at 3–4.

because the demand is not under oath; (3) failure to establish a proper purpose; and (4) the books and records are not necessary and essential to Plaintiff's stated purposes or identified with the requisite precision.[26] The parties served discovery requests on January 3, 2023, and exchanged discovery responses on January 10. In its interrogatory responses, Blue Foundry confirmed under oath that "it will not contend that Plaintiff's stated purposes are not his actual purposes."[27] Blue Foundry also pressed merits-based defenses, including that any future plenary action challenging the Director Awards would be dismissed under the stockholder ratification doctrine.[28] Blue Foundry refused to answer Plaintiff's interrogatory

---

[26] *See* D.I. 7 at 11–12.

[27] D.I. 43, Ex. 8 [hereinafter "Blue Foundry's Interrog. Resp."] at Resp. No. 8. The position that the plaintiff holds an improper purpose is an affirmative defense in response to a books and records action. *Rivest v. Hauppauge Digital, Inc.*, 2022 WL 3973101, at *9 (Del. Ch. Sept. 1, 2022) ("And the Company raised a series of affirmative defenses, including: . . . (v) the contention that the lawsuit was "brought for an improper purpose . . . ."); *Chammas v. NavLink, Inc.*, 2015 WL 5121095, at *1 n.3 (Del. Ch. Aug. 27, 2015) ("The affirmative defenses include . . . that the scope of the demands exceeds any proper purpose . . . ."); *Woods Tr. of Avery L. Woods Tr. v. Sahara Enters., Inc.*, 238 A.3d 879, 891 (Del. Ch. 2020) ("[O]nce a stockholder has identified a proper purpose, . . . the burden shifts to the corporation to prove that the stockholder's avowed purpose is not her actual purpose and that her actual purpose for conducting the inspection is improper." (citing *Pershing Square, L.P. v. Ceridian Corp.*, 923 A.2d 810, 817 (Del. Ch. 2007))).

[28] *E.g.*, Blue Foundry's Am. Interrog. Resp. at Resp. No. 3; *cf. Amalgamated Bank v. UICI*, 2005 WL 1377432, at *2 (Del. Ch. June 2, 2005) (observing that evaluating the merits in a Section 220 action of affirmative defenses to plenary claims, in some circumstances, is inconsistent with Section 220's summary nature); *accord CHC Invs., LLC v. FirstSun Cap. Bancorp*, 2019 WL 328414, at *3 n.47 (Del. Ch. Jan. 24, 2019) ("This decision does not evaluate that argument, or FirstSun's argument that a general

asking Blue Foundry to confirm or deny what, if any, formal board materials existed.[29]

On January 12, Plaintiff's counsel emailed Blue Foundry's counsel asking if the Company still intended to take Plaintiff's deposition, informing counsel that "Mr. Seidman will be in Florida for the rest of the month" and offering to make him available for a remote deposition on January 23 or 27.[30] The Company insisted that Plaintiff's deposition be held in person in Delaware. The next day, Defendant noticed Plaintiff's deposition for Delaware,[31] forcing Plaintiff to seek relief from this Court.[32] The Court granted a protective order, noting that

---

release bars CHC's plenary claims, which are best addressed in the Plenary Action." (citing *Amalgamated Bank*, 2005 WL 1377432, at *2)).

[29] Blue Foundry's Am. Interrog. Resp. at Resp. No. 21 ("Category 2: Defendant will not provide the information requested in Request No. 21."). During oral argument, defense counsel argued that Plaintiff should nevertheless have been able to *infer* that responsive formal board materials existed because: (1) in response to interrogatory number 21, Blue Foundry objected that the scope of Plaintiff's inspection request "goes beyond the scope of an 8 *Del. C.* 220 action for books and records where formal board material exists"; and (2) in response to interrogatory number 12, Blue Foundry identified the board and Compensation Committee meetings during which the Director Awards, Management Awards and Equity Plan were discussed. D.I. 53 [hereinafter "Hr'g Tr."] at 49–50 (quoting Blue Foundry's Am. Interrog. Resp. at Resp. No. 21). Defense counsel conceded that these responses did not amount to actually telling Plaintiff that formal board materials existed for each of the meetings identified in response to interrogatory number 12. *Id.* at 50.

[30] D.I. 47, Ex. 15.

[31] D.I. 15.

[32] D.I. 17.

Defendant "offer[ed] no real reason" the deposition needed to occur in Delaware, particularly since Defendant was not pressing an improper purpose defense.[33]

At Plaintiff's deposition, Blue Foundry's counsel initiated a persistent line of questioning as to whether Plaintiff was "involved in the Jewish Mafia" based on his conversation with Nesci.[34] Plaintiff clarified that he "knew" some "major real estate players, who were referred to as" members of that purported group.[35] Blue Foundry's counsel continued interrogating Plaintiff about "the Jewish mafia," and Plaintiff objected that, "[y]ou know, you use that term—it's disgraceful that you use that term that way."[36] Despite Plaintiff's deposition testimony that he was not a member of that purported group, Blue Foundry continued to claim the opposite, asserting in an interrogatory response that "Plaintiff stated that he is a member of a group often called the 'Jewish Mafia.'"[37]

After 8:00 p.m. on the night before the close of discovery, Blue Foundry for the first time sought to assert as an affirmative defense that Plaintiff's stated

---

[33] D.I. 25.

[34] Seidman Dep. 61–62.

[35] *Id.*

[36] *Id.*

[37] Blue Foundry's Am. Interrog. Resp at Resp. No. 8.

purpose was not his actual purpose.[38] This change occurred too late for Plaintiff to take discovery, to which he is entitled, into an issue on which the Company bears the burden.[39]

On February 1, the Company identified its list of trial witnesses.[40] In response, Plaintiff's counsel sent an email stating:

---

[38] *Compare* Blue Foundry's Interrog. Resp at Resp. No. 8 (stating on January 10, 2023: "Subject to and without waiving its Specific and General Objections, Defendant states that at this time it will not contend that Plaintiff's stated purposes are not his actual purposes, but will contend that those purposes are not adequate to justify the Demand."), *with* Blue Foundry's Am. Interrog. Resp at Resp. No. 8 (stating on January 30, 2023: "Subject to and without waiving its Specific and General Objections, Defendant continues to assert as its principal defense that Plaintiff has not stated a proper purpose for his inspection of the Company's books and records. . . . However, based upon Plaintiff's deposition testimony, Blue Foundry now believes that Plaintiff's stated purpose is not his actual purpose. . . . As is clear, Plaintiff is attempting to use his leverage as a stockholder of the Company to gain benefits for himself, and his books and records demand is part of this effort. This is not a proper purpose for a books and records demand."). The substantial completion deadline was January 17, 2023, and discovery closed January 30. D.I. 6 ¶¶ 2(d), 2(f).

[39] *Woods*, 238 A.3d at 891 (citing *Pershing Square*, 923 A.2d at 817); *Chammas*, 2015 WL 5121095, at *1–2 (holding that Section 220 plaintiffs were entitled to discovery into the defendant's affirmative defenses).

[40] D.I. 30.

> We are in receipt of defendant's witness list. We see that defendant has disclosed that it "may" call plaintiff at trial but not whether it "expects" to do so, as required by Paragraph 2(g) of the scheduling order. See Dkt. 6 ¶ 2(g) ("Parties exchange lists identifying any witnesses the Parties *expect* to call at trial."). Could you please clarify whether defendant expects to call plaintiff as a witness at trial? We would like to give our client a definitive answer this week on whether he needs to appear live at trial so that he can make the necessary travel arrangements.[41]

Defendant's counsel responded: "I'm not sure what the notable difference is between 'may' and 'expects,' as neither term commits either party to definitively calling Mr. Seidman as a witness at trial. In any event, we 'expect' to call Mr. Seidman at trial."[42] In spite of this email exchange, on March 21, Blue Foundry misrepresented to the Court: "Contrary to Plaintiff's false claims, it was ***Plaintiff*** who insisted on live testimony."[43]

The parties filed a Joint Pre-Trial Stipulation and [Proposed] Order on February 9, and filed pre-trial briefs on February 13.[44] At the February 15 pretrial conference, the Court warned that "the manner in which the company has litigated

---

[41] D.I. 47, Ex. 16 (emphasis in original).

[42] *Id.*

[43] *Compare* D.I. 44 [hereinafter "Opp."] ¶ 11 (emphasis in original), *and id.* ¶ 20 (claiming Plaintiff "insist[ed] on live testimony"), *with* D.I. 47, Ex. 16 (February 1, 2023 email from Plaintiff's counsel asking defense counsel to "clarify whether defendant expects to call plaintiff as a witness at trial" and adding that "[w]e would like to give our client a definitive answer this week on whether he needs to appear live at trial so that he can make the necessary travel arrangements").

this issue to date may very well rise to the level of fee shifting under *Gilead*."[45]

The Court observed the Company "changed its position" and began asserting the

affirmative defense that Plaintiff's purpose was not his actual purpose "at a

moment when it was too late for [Plaintiff] to take discovery into [Blue Foundry's

affirmative defense], on which the [C]ompany bears the burden, which he's

entitled to do."[46]  The Court also questioned why the Company was "going through

the excessive exercise of calling Mr. Seidman live on a proceeding that's often on

a paper record."[47]

After the pretrial conference, Blue Foundry agreed to produce compensation

consulting reports and responsive formal board materials.  On February 20, two

days before trial, the parties filed a Proposed Final Order and Judgment,[48] which

this Court entered the next day (the "Inspection Order").[49]  On February 24,

pursuant to the Inspection Order, Blue Foundry produced approximately sixty

---

[44] D.I. 31, D.I. 33, D.I. 34.

[45] D.I. 42 [hereinafter "Pre-Trial Tr."] at 13.

[46] *Id.* at 12.

[47] *Id.* at 13.

[48] D.I. 39.

[49] D.I. 40.

pages of documents.[50] The two compensation consulting reports that were the focus of the Demand totaled fifteen pages.[51] The Company did not designate any portion of its production confidential.[52]

Plaintiff incurred $223,651.60 in attorneys' fees and expenses through February 20, 2023.[53] On March 14, 2023, Plaintiff filed a Motion for an Award of Attorneys' Fees and Expenses (the "Motion").[54] On March 21, 2023, Blue Foundry filed its Opposition to Plaintiff's Motion for An Award of Attorneys' Fees and Expenses (the "Opposition").[55] On March 24, 2023, Plaintiff filed his Reply in Support of Motion for an Award of Attorneys' Fees and Expenses.[56]

Blue Foundry's Opposition contained several falsehoods. Blue Foundry claimed it "did not accuse Plaintiff of belonging to the 'Jewish mafia[,]'"[57] even

---

[50] D.I. 47, Ex. 13 at 2.

[51] *See* Blue Foundry's Am. Interrog. Resp at Resp. No. 21 ("The approximate volume of documents is 15 pages."); *see also* Hr'g Tr. at 26.

[52] Opp. ¶ 24; Hr'g Tr. at 26.

[53] *See* D.I. 43 at Affidavit of John M. Seaman, Esq. in Support of Plaintiff's Motion for an Award of Attorneys' Fees and Expenses [hereinafter "Seaman Aff."] ¶¶ 3–4.

[54] D.I. 43.

[55] Opp.

[56] D.I. 47.

[57] Opp. ¶ 21.

though it had done so.[58]  Blue Foundry stated it "did not know" that Plaintiff was located in Florida when it noticed Plaintiff's deposition for Delaware, even though it did.[59]  Blue Foundry represented to the Court at the pretrial conference and repeated in its Opposition that it had identified whether responsive formal board materials existed,[60] even though it had not.[61]  And Blue Foundry claimed "it was *Plaintiff* who insisted on live testimony" at trial, even though it was Blue Foundry that insisted that Plaintiff appear live.[62]

The Court heard argument on May 9, 2023, and granted the Motion.  In keeping with *Gilead*'s observation that glaringly egregious litigation conduct in books and records actions exacerbates the burdens that meritorious litigation places on this Court, I asked Plaintiff's counsel to draft a proposed opinion shifting fees

---

[58] Seidman Dep. 61; Blue Foundry's Am. Interrog. Resp at Resp. No. 8 ("Plaintiff stated that he is a member of a group often called the 'Jewish Mafia.'"); *see also* Hr'g Tr. 44–48.

[59] *Compare* Opp. ¶ 12 n.2 (claiming that Blue Foundry "did not know" that Plaintiff was located in Florida when it noticed Plaintiff's deposition for Delaware on January 13, 2023), *with* D.I. 47, Ex. 15 at 1 (January 12, 2023 email from Plaintiff's counsel to defense counsel stating that "Mr. Seidman will be in Florida for the rest of the month").

[60] Pre-Trial Tr. at 14–15 ("[ATTORNEY NACHBAR:]  Your Honor also said that we haven't identified whether documents exist.  We have. . . . We're not hiding the ball."); Opp. ¶ 23.

[61] Blue Foundry's Am. Interrog. Resp at Resp. No. 21 ("Category 2:  Defendant will not provide the information requested in Request No. 21.").

[62] *Supra* note 43 (emphasis in original).

under *Gilead* to Defendant, at Defendant's cost, which I would review de novo and make it my own.[63]   Plaintiff filed his proposed order on June 2.[64]   This is my decision regarding the Motion.

## II.   ANALYSIS

Delaware courts follow the American Rule that each party is expected to pay its own attorneys' fees regardless of the outcome of the litigation.   But this court retains the ability to shift fees when faced with vexatious litigation conduct "to deter abusive litigation and to protect the integrity of the judicial process."[65]   This court may award fees "in its discretion . . . 'where equity requires.'"[66]   To capture the sorts of vexatious activities that the bad-faith exception is intended to address, this court employs the "glaring egregiousness" standard.[67]   Delaware courts have

---

[63] Hr'g Tr. 69 ("Because of the false statements in the opposition brief, I would like to ask Abrams & Bayliss to write the draft opinion and submit that to the Court.  The Court will edit it and make it its own *de novo*."); D.I. 54; *Pettry v. Gilead Scis., Inc.*, 2020 WL 6870461, at *30 (Del. Ch. Nov. 24, 2020).

[64] D.I. 55.

[65] *Montgomery Cellular Hldg. Co. v. Dobler*, 880 A.2d 206, 227 (Del. 2005) (citing *Johnston v. Arbitrium (Cayman Is.) Handels AG (Johnston II)*, 720 A.2d 542, 546 (Del. 1998)).

[66] *Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real Estate Fund*, 68 A.3d 665, 687 (Del. 2013) (quoting *Burge v. Fidelity Bond & Mortg. Co.*, 648 A.2d 414, 421 (Del. 1994)).

[67] *See, e.g.*, *RBC Cap. Mkts., LLC v. Jervis*, 129 A.3d 816, 879 (Del. 2015) (affirming this Court's determination to shift fees under the "glaring egregiousness" standard); *Isr. Disc. Bank of N.Y. v. First State Depository Co.*, 2013 WL 2326875, at *28–29 (Del. Ch.

shifted fees for glaringly egregious conduct, such as forcing a plaintiff to file suit to "secure a clearly defined and established right" to inspect the company's books and records.[68] In *Pettry v. Gilead Sciences, Inc.*, this Court granted the Section 220 plaintiffs leave to move for fee-shifting where the defendant "exemplified the trend of overly aggressive litigation strategies by blocking legitimate discovery, misrepresenting the record, and taking positions for no apparent purpose other than obstructing the exercise of Plaintiff's statutory rights" to books and records.[69]

After Blue Foundry declined to produce a single document to Plaintiff, forcing him to commence litigation, Blue Foundry took a series of litigation positions that, when viewed collectively, were glaringly egregious.

Blue Foundry pressed that Plaintiff was not entitled to inspection because he could not establish a credible basis for wrongdoing. At oral argument, Blue

---

May 29, 2013) (applying the "glaring egregiousness" standard in assessing potential fee shifting); *eBay Domestic Hldgs., Inc. v. Newmark*, 16 A.3d 1, 47–48 (Del. Ch. 2010) (same); *In re Charles Wm. Smith Tr.*, 1999 WL 596274, at *2–4 (Del. Ch. July 23, 1999) (same).

[68] *McGowan v. Empress Ent., Inc.*, 791 A.2d 1, 4 (Del. Ch. 2000) ("[I]f McGowan had a clearly established legal right to inspect Empress's books and records, and Empress's conduct forced him to bring this action to secure that right, then the defendant can be found to have acted in bad faith and be ordered to pay the plaintiff's legal fees and expenses."); *accord Donnelly v. Keryx Biopharmaceuticals, Inc.*, 2019 WL 5446015, at *6 (Del. Ch. Oct. 24, 2019); *Norman v. US MobilComm, Inc.*, 2006 WL 1229115, at *4 (Del. Ch. Apr. 28, 2006).

[69] 2020 WL 6870461, at *30.

Foundry argued Plaintiff was required to demonstrate a credible basis to support not only his investigative purpose but also his communicative purpose because, in Blue Foundry's view, the Demand cabined Plaintiff's communicative purpose to issues relating to mismanagement.[70] But the Demand states that Plaintiff seeks "to communicate with other Company stockholders *regarding matters relating to their interests as stockholders and* as to each of the above topics, so that stockholders may effectively address any mismanagement or improper conduct, *including without limitation, through litigation, proxy contest or by other corrective measures.*"[71] The Demand therefore made clear that Plaintiff sought to communicate with stockholders not only regarding "each of the above topics" but also regarding "matters relating to their interests as stockholders" in connection with an impending "proxy contest."[72] And even if the Company was correct in cabining Plaintiff's communicative purpose to mismanagement, Plaintiff's criticism of Blue Foundry's compensation plan was supported by two experts that

---

[70] Hr'g Tr. 32; *see also* Opp. ¶ 18 (arguing because Plaintiff's intention to communicate with other stockholders was to "effectively address any mismanagement or improper conduct," means there was "no proper purpose to communicate with stockholders, as there was no 'mismanagement or improper conduct' to address").

[71] Demand at 4 (emphasis added).

[72] *Id.*

Blue Foundry did not challenge,[73] and Plaintiff pressed a disclosure violation based on the Proxy's reference to the Compensation Committee's reliance on a nonexistent peer group analysis.[74] Standing alone, Blue Foundry's credible basis challenge might not inspire fee-shifting, but Blue Foundry faced an uphill climb.

And Blue Foundry raised more hurdles. Blue Foundry claimed that Plaintiff was not entitled to inspection because any future plenary action challenging the Director Awards would be dismissed under the stockholder ratification doctrine. In so many words, Blue Foundry argued that Plaintiff was required to demonstrate an actionable claim. Delaware law is clear that a books and records proceeding "is not the time for a merits assessment of [a plaintiff's] potential claims against [the corporation's] fiduciaries."[75] Under *AmerisourceBergen*, a stockholder who demonstrates a credible basis from which the court can infer wrongdoing or mismanagement need not demonstrate that the wrongdoing or mismanagement is actionable.[76]

---

[73] *See* Seidman Dep. 146–50.

[74] Proxy at SEIDMAN_00197; D.I. 47, Ex. 13 at 1.

[75] *AmerisourceBergen Corp. v. Lebanon Cnty. Emps.' Retirement Fund*, 243 A.3d 417, 437 (Del. 2020); *Lavin v. W. Corp.*, 2017 WL 6728702, *10 (Del. Ch. Dec. 29, 2017).

[76] 243 A.3d at 436 (quoting *Lavin*, 2017 WL 6728702, *9).

Blue Foundry attacked the necessary and essential prong, even with respect to those formal board materials that *AmerisourceBergen* indicates should nearly always be produced.[77] At the same time, Blue Foundry improperly refused to state what formal board materials existed.[78]

Blue Foundry took aggressive positions in discovery. Despite knowing that Plaintiff was in Florida, Blue Foundry refused to proceed by video deposition and insisted that Plaintiff appear in person for a half-day deposition in Delaware, forcing Plaintiff to obtain a protective order.[79] After the close of discovery, Blue Foundry sandbagged Plaintiff with an unsupported improper purpose defense, claiming "Plaintiff's stated purpose [was] not his actual purpose."[80] In pressing that defense, Blue Foundry accused Plaintiff of belonging to "the Jewish Mafia,"

---

[77] Pre-Trial Tr. at 13.

[78] *Lebanon Cnty. Emps.' Retirement Fund v. AmerisourceBergen Corp.*, 2020 WL 132752, at *26 (Del. Ch. Jan. 13, 2020) ("Just as a defendant can serve interrogatories or depose a plaintiff about its proper purpose, so too can a plaintiff serve interrogatories or notice a Rule 30(b)(6) deposition to understand what books and records exist and who has them." (citing *Wal-Mart Stores, Inc. v. Ind. Elec. Workers Pension Tr. Fund IBEW*, 95 A.3d 1264, 1269 (Del. 2014))).

[79] D.I. 17; D.I. 22; D.I. 24.

[80] D.I. 7 at 11–12; *supra* note 38; *compare, e.g.*, D.I. 34 at 35 ("[T]he **only** purpose for the requested inspection is for leverage against the Company so that Plaintiff can extort it for his own personal gain." (emphasis in original)), *with, e.g.*, Seidman Dep. 75–76 (testifying that he never even "suggest[ed] any arrangement by which [he] or an[y] entity of [his] would be compensated for the origination loans by Blue Foundry" and only wanted to place his designee on the board) (emphasis added).

even after Plaintiff resisted Blue Foundry's mistaken characterization of his conversation with Nesci and his deposition.[81] And Blue Foundry insisted on calling Plaintiff as a live witness in this books and records proceeding that typically would have, and plainly could have, proceeded on a paper record.[82]

After the Court invoked *Gilead* and Plaintiff moved for fees, Blue Foundry and its counsel dug further into the mud: their brief opposing fee-shifting made four demonstrably false statements.[83] First, that Blue Foundry did not accuse Plaintiff of belonging to the "Jewish Mafia"; second, that Blue Foundry did not know Plaintiff was in Florida when it noticed his deposition for Delaware; third, that it had identified whether responsive board materials existed; and fourth, that it was Plaintiff, not Blue Foundry, who insisted on Plaintiff's live appearance.

Blue Foundry's litigation conduct was glaringly egregious. Blue Foundry: (i) forced Plaintiff to file suit to "secure a clearly defined and established right" to

---

[81] *Supra* note 58.

[82] PTO ¶ 81(a).

[83] Incredibly, when the Court challenged Blue Foundry's wielding of the term "Jewish Mafia," Blue Foundry's counsel contended they were taking the high road by not asserting Mr. Nesci, who counsel described as Italian American, was offended by the term. Hr'g Tr. 47–48 ("If he were going to play the faux outrage game like plaintiff, we would be asserting that we're deeply offended that Mr. Seidman brought up the term 'Mafia' in a meeting with Mr. Nesci, an Italian American."). To be clear, this is the low road.

inspect the Company's books and records;[84] (ii) "unnecessarily prolonged or delayed litigation" by refusing to produce any documents;[85] (iii) "increased the litigation's cost" by, among other things, insisting in bad faith on an in-person deposition leading to motion practice;[86] (iv) "completely change[d] [its] legal argument" in a way which would prevent Plaintiff from taking discovery to which he was entitled;[87] and (v) made multiple misrepresentations to the Court.[88]  Justice requires fee shifting as mitigation for such serious "vexatious behavior."[89]

"Delaware law dictates that, in fee shifting cases, a judge determines whether the fees requested are reasonable."[90]  The Court "has broad discretion in

---

[84] *Supra* note 68.

[85] *RBC Cap. Mkts., LLC v. Educ. Loan Tr. IV*, 2016 WL 703852, at \*3 (Del. Super. Feb. 17, 2016) (quoting *Johnston II*, 720 A.2d at 546).

[86] *ASB Allegiance Real Estate Fund v. Scion Breckenridge Managing Member, LLC*, 2013 WL 5152295, at \*10 (Del. Ch. Sept. 16, 2013) (quoting *Scion*, 68 A.3d at 687).

[87] *In re SS & C Techs., Inc. S'holders Litig.*, 948 A.2d 1140, 1151 (Del. Ch. 2008) (citation omitted); *Gilead*, 2020 WL 6870461, at \*30 ("Gilead exemplified the trend of overly aggressive litigation strategies by blocking legitimate discovery, misrepresenting the record, and taking positions for no apparent purpose other than obstructing the exercise of Plaintiffs' statutory rights.").

[88] *Gilead*, 2020 WL 6870461, at \*30.

[89] *Id.* at \*30 n.280 (internal quotation marks omitted) (quoting *Martin v. Harbor Diversified, Inc.*, 2020 WL 568971, at \*1 (Del. Ch. Feb. 5, 2020)).

[90] *Mahani v. Edix Media Grp., Inc.*, 935 A.2d 242, 245 (Del. 2007) (citing Del. Lawyers' R. Prof'l Conduct 1.5(a)(1)(a)); *see also Aveta v. Bengoa*, 2010 WL 3221823, at \*4 (Del. Ch. Aug. 13, 2010) (noting that the Court assesses fee awards for reasonableness).

determining the amount of fees and expenses to award."[91]  The Court reviews a fee

application pursuant to the factors set forth in Rule 1.5(a) of the Delaware

Lawyers' Rules of Professional Conduct.[92]  "Determining reasonableness does not

require that this Court examine individually each time entry and disbursement."[93]

Nor does it "require the Court to assess independently whether counsel

appropriately pursued and charged for a particular motion, line of argument, area

of discovery, or other litigation tactic."[94]  "For a Court to second-guess, on a

hindsight basis, an attorney's judgment" as to whether work was necessary or

---

[91] *Black v. Staffieri*, 2014 WL 814122, at *4 (Del. Feb. 27, 2014) (TABLE) (citing *Kaung v. Cole Nat'l Corp.*, 884 A.2d 500, 506 (Del. 2005)).

[92] *See Mahani*, 935 A.2d at 245–46.  Del. Lawyers' R. Prof'l Conduct 1.5(a) ("(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly; (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; [and] (8) whether the fee is fixed or contingent.").

[93] *Aveta*, 2010 WL 3221823, at *6 (citing, among other cases, *M & G Polymers USA, LLC v. Carestream Health, Inc.*, 2010 WL 1611042, at *76 (Del. Super. Apr. 21, 2010) (finding no authority that "requires this Court to engage in a line-by-line analysis of the components of an attorneys' fee application when an award of fees is based upon the bad faith exception to the American Rule")).

[94] *Weil v. VEREIT Operating P'ship, L.P.*, 2018 WL 834428, at *12 (Del. Ch. Feb. 13, 2018) (quoting *Danenberg v. Fitracks, Inc.*, 58 A.3d 991, 997 (Del. Ch. 2012)).

appropriate "is hazardous and should whenever possible be avoided."[95]

"When awarding expenses as a contempt sanction or for bad faith litigation tactics, this Court takes into account the remedial nature of the award."[96] In those cases, the fee award "is designed to make whole the party who was injured by the other side's contumely. The remedial nature the award commends putting primary emphasis on reimbursing the injured party. The results achieved are of secondary importance."[97] And when assessing the aggregate fees requested in situations involving contempt or bad faith, this Court considers whether they "are within the range of what a party reasonably could incur over the course of . . . pursuing an

---

[95] *Arbitrium (Cayman Is.) Handels AG v. Johnston* (*Johnston I*), 1998 WL 155550, at *4 (Del. Ch. Mar. 30, 1998)), *aff'd*, 720 A.2d 542 (Del. 1998); *accord Sparton Corp. v. O'Neil*, 2018 WL 3025470, at *6 (Del. Ch. June 18, 2018) (noting that "the hourly rates charged by Defendants' counsel are not excessive, and the staffing of attorneys appears appropriate" and should not be second-guessed); *Aveta*, 2010 WL 3221823, at *8 (expanding the rationale and noting where "staffing appears appropriate" it "need not be second-guessed"). Still, the Court may consider "whether the number of hours devoted to litigation was excessive, redundant, duplicative or otherwise unnecessary," *Fitracks*, 58 A.3d at 996 (quoting *Mahani*, 935 A.2d at 247–48), and may decrease an award where the applicant's "own litigation efforts have in some ways been less than ideal in terms of timeliness or prudent focus," *Auriga Cap. Corp. v. Gatz Props.*, 40 A.3d 839, 882 (Del. Ch. 2012), *aff'd*, 59 A.3d 1206 (Del. 2012).

[96] *Aveta*, 2010 WL 3221823, at *6 (citing *In re SS &C Techs., Inc. S'holders Litig.*, 2008 WL 3271242, at *3 n.14 (Del. Ch. Aug. 8, 2008), and *Johnston I*, 1998 WL 155550, at *3).

[97] *Id.* (citation omitted).

adversary engaged in a mix of open defiance, evasion and obstruction."[98]

Blue Foundry did not dispute the reasonableness of Plaintiff's fees and expenses in its Opposition or at the May 9 hearing, and the Court finds Plaintiff's fee request reasonable under the circumstances.[99]

### III. CONCLUSION

For the foregoing reasons, Plaintiff's Motion for an Award of Attorneys' Fees and Expenses is **GRANTED**. Plaintiff's counsel shall file a Rule 88 affidavit identifying Plaintiff's reasonable attorneys' fees and expenses incurred in connection with preparing the draft opinion within five business days of this opinion.[100]

Sincerely,

*/s/ Morgan T. Zurn*

Vice Chancellor

MTZ/ms

cc:  All Counsel of Record, via *File & ServeXpress*

---

[98] *Id.* (internal quotation marks omitted) (citing *Aveta Inc. v. Bengoa*, 986 A.2d 1166, 1178 (Del. Ch. 2009)).

[99] Seaman Aff.; D.I. 54 ¶ 2 ("Plaintiff is hereby awarded attorneys' fees and expenses in the amount of $223,651.60 to be paid by Defendant Blue Foundry Bancorp within five (5) business days of the entry of this Order.").

[100] D.I. 54 ¶ 3.